JOHN GREEN SMITH V. THOMAS M. LOGAN ET AL.

FILED NOVEMBER 4, 1897.   No. 7547.

</div>

Fraudulent Conveyances: EVIDENCE. In a contest between vendees of goods and creditors of the vendor, evidence examined and *held* insufficient to sustain a verdict that the sale was made in good faith.

ERROR from the district court of Franklin county. Tried below before BEALL, J.   *Reversed.*

*Sheppard & Black*, for plaintiff in error.

*James McNeny, contra.*

IRVINE, C.

This was an action of replevin by the defendants in error, Logan and Shryock, against the plaintiff in error, Smith, who was sheriff of Franklin county, for a stock of merchandise and certain other chattels. Logan and Shryock claimed as purchasers from one Petring. The sheriff justified under a writ of attachment against Petring sued out by a creditor. The only issue litigated was the *bona fides* of the transfer by Petring to the plaintiffs. A jury trial resulted in a verdict in favor of plaintiffs.

Petring was engaged in business in the town of Upland. Logan lived twelve miles from that point and Shryock six miles. For some time Petring had been in-

debted to the Bank of Upland in the sum of $800, Logan and Shryock being indorsers. On October 9, 1893, the bank insisting that some adjustment be made upon a different basis, and expressing a preference for the paper of Logan and Shryock, without Petring's name thereon, Logan and Shryock gave their note, payable on demand, to the bank, and took from Petring his demand note, secured by mortgage on the stock of merchandise. As to subsequent transactions we have nothing material except the testimony of Logan and Shryock themselves. The following is their narrative: On October 13, Logan went to Upland and asked Petring to pay the note, saying that he needed the money. Petring expressed his inability to pay, but asked Logan to buy him out. Logan offered to trade land for the goods, but Petring said he must have some money to pay debts. It was then arranged that if Logan could get the necessary money he should pay Petring $1,000 in cash, assume the $800 indebtedness, and convey to Petring eighty acres of land in Fayette county, Illinois, estimated at $3,200, thus making a purchase price of $5,000. Logan then went out and opportunely met Shryock, to whom he imparted the contemplated bargain, requesting Shryock to let him have $600 wherewith to consummate it. Shryock happened to have that much currency in his pocket and expressed his willingness to let Logan have it, but inquired about security. Logan said he would give him an interest in the store. He suggested that Shryock advance the $600, assume half of the $800 indebtedness, and make to Logan his note for $1,500 and take in exchange a half interest. Shryock forthwith agreed, although he had no knowledge as to the value of the goods except Logan's statements. Logan and his wife then drove to Riverton, some twenty-odd miles from Upland, and Shryock and Petring followed, arriving between eleven o'clock and midnight. Mr. Fulton, a notary public, had been employed by Logan, and he proceeded to draw the instruments of conveyance,—a bill of sale of

the chattels from Petring to Logan, a bill of sale of a half interest to Shryock from Logan, and a deed of the Illinois land from Logan to Petring. The money was paid, the $800 note surrendered, and the instruments delivered some time after midnight. Then a significant transaction took place. Petring conveyed the Illinois land to Shryock. This feature will be referred to later. After all this Shryock and Petring at once drove back to Upland, arriving between six and seven in the morning, when possession of the goods was delivered to Shryock. Logan remained in Riverton until morning, when he proceeded to Bloomington, the county seat, and filed for record not only the two bills of sale, but also the mortgage he and Shryock had, five days before, taken from Petring to secure a note which had been satisfied and delivered up the night before.

What did Logan and Shryock receive through this transaction? There can be no doubt that they obtained property worth practically $5,000. One witness says that the stock of goods, "if it had to be sold for what it would bring, would bring about $3,500." In addition to the stock of goods there were included in the sale several hundred dollars' worth of accounts, two horses, a harness, two heifers, a small frame barn, and the furniture in Petring's bedroom,—in fact everything Petring possessed. Other witnesses, including Logan himself, place a much higher value on the stock of goods.

What did they give for this property? To answer this question we must look into the transfer of the Illinois land. It was, as has been said, significant, that this was conveyed to Shryock by Petring almost as soon as he acquired it, and apparently as part of the same transaction. Neither Shryock nor Petring had seen the land; and Logan swears that even he had not. To account for the second transfer Shryock testifies that after the other business had been completed, and after Logan had left Fulton's office, it occurred to Shryock that as Petring owed him $240 for borrowed money, it would be a good

time to request payment. Parenthetically it may be here remarked that the accounts of Petring show payments of cash by Shryock in settlement of his account for goods, during the period when these small loans were outstand-ing. Petring was again unwilling to pay and again proposed a purchase instead, this time of the recently acquired Illinois land. It was agreed that Shryock should surrender the notes for $240, which he seems to have had conveniently with him, pay $160 in cash, and convey some property which is nowhere more definitely described than "some mineral rights in Pennsylvania." The money was then paid and the notes surrendered, but the "mineral rights" were not then conveyed, because Shryock did not know their description. Petring soon after left the region without requesting a conveyance or leaving Shryock an address, and he has never made any request concerning these rights. Shryock says that some time thereafter he procured a description of the "mineral rights" and executed a deed thereof to Petring, but he says that he was then garnished in a suit in the county court against Petring and was required, by order of that court, to deposit the deed there. It would be in-teresting to ascertain by exactly what procedure the county court of Franklin county thus contrived to sub-ject real estate in another state to the satisfaction of Petring's debts, but unfortunately for such inquiry the records of the court were not offered to corroborate Shry-ock. No memorandum of the agreement was made. It is as certain as anything can be, beyond the domain of pure mathematics, that these "mineral rights" were not considered by either party as a material part of the bar-gain, and that Petring completely ignored them. We have thus presented the somewhat unusual spectacle of a man driving across country, almost fifty miles, during the night, for the purpose of buying land for $3,200 and immediately selling it for $400. No one seems to have suggested anything concerning the title to the Illinois land, or even its character. On these points implicit con-

fidence seems to have been reposed all around. We have in the record the testimony of several witnesses residing near the land, as to its character and value. They agree that it is bottom land, subject to overflow, covered with small timber, and worth from three to five dollars an acre. It is suggested in argument that this is contradicted by Logan, but counsel are in error. Logan's testimony as to value was excluded, and properly so, as he did not show himself qualified to testify. It follows from what has been said that Logan and Shryock gave just $2,200 for Petring's property, and we think it too clear for doubt that the parties never considered the Illinois land to be worth more, or that they really estimated it at more than the $400 at which it passed as between Petring and Shryock.

When a man is willing to sell property worth $5,000 for less than half that sum he usually has some urgent reason for so doing, and a prudent purchaser is apt to seek that reason. There can be no doubt that Petring's desire to make such a sale was due to the fact that he owed, including his debts to Logan and Shryock, about $4,925. If he could discharge $1,040 of this and obtain $1,160 in cash at the same time, he might be willing to make the sacrifice. Logan and Shryock must have known of his condition. They knew his demand note for $800 had been in bank for three months, and that the bank had insisted that Petring's name should come off. It seems to have been regarded by the bank as a positive injury to the paper. Petring told Logan that he must have money to pay debts, and mentioned one debt at least. Furthermore he told Logan that he did not see how he "could pull through," and Logan says that he took it from the conversation that Petring intended to leave the country. Again, all the indebtedness, except that to plaintiffs themselves, appeared on Petring's ledger, which Logan examined. Logan says he examined it merely to ascertain the amount of collectible accounts, but he could hardly find what accounts were on the credit

side without, at the same time, seeing what were on the other. If they did not know the precise amount of Petring's debts, they at least knew that his condition was desperate and that he so considered it.

The plaintiffs suddenly, and without any of that deliberation which usually characterizes transactions of considerable magnitude, bought property which would require them to at least partially change their vocation in life from farmers to merchants. They knowingly bought property at less than half its value from a man they knew to be deeply in debt and unable to pay his debts except out of the property. They went twenty or more miles away from home to consummate the bargain, yet such was their haste, or their desire for secrecy, that they transacted the business at midnight. They deliberately sought to make the transaction look different from what it was by juggling conveyances of land in a distant state, the value of which, as considered by the purchaser even, they grossly overestimated. From eighty acres of land worth $40 an acre, it shrank by transfers to $400 and certain undefined, if not indefinable, mineral rights, and these vanished mysteriously, something like Emerson's road, which dwindled into a squirrel track and ran up a tree. This court has always been careful not to infringe upon the proper province of the jury, and it is with particular reluctance that we interfere in a case of this character, where the issue is wholly one of fact, and that fact to be ascertained largely by inference from others. But this case is too plain to permit of a reasonable difference of opinion. Sane men do not act as the plaintiffs did, from honest motives. Accepting their testimony in every point where it can be accepted without self-stultification, it is impossible, without reasoning abnormally, to believe that plaintiffs were not fully conscious of an illegal intent on the part of Petring, if they did not actively participate in that intent, and become conspirators with him. The case is one where the verdict is wholly unsustained by the evi-

dence.    The jury placed too little faith in the intelligence of plaintiffs and too much in their morals.

REVERSED AND REMANDED.